UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Bill Norkunas,

        Plaintiff,

vs.                                    Case No. 3:09-cv-934-J-32MCR

Seahorse NB, LLC,

        Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Bill Norkunas has brought this action pursuant to Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq,* seeking the removal of certain alleged architectural barriers on Defendant's property, the Seahorse Oceanfront Inn (the "Seahorse"), a motel in Jacksonville Beach, Florida (Doc. 1).[1]

**I.   THE AMERICANS WITH DISABILITIES ACT**

Title III of the ADA provides that:

---

[1] On October 6, 2009, the Seahorse moved to dismiss Mr. Norkunas' complaint for lack of standing (Doc. 6). On June 16, 2010, after conducting an evidentiary hearing on the matter, the Court held that Mr. Norkunas does not have standing to challenge any alleged barriers in the guest rooms of the Seahorse, but does have standing to challenge other alleged barriers (Doc. 28). See Norkunas v. Seahorse NB, LLC, 720 F. Supp. 2d 1313 (M.D. Fla. 2010). The case was tried on February 14, 2011 (Doc. 61) and the parties submitted post-trial proposed findings of fact and conclusions of law (Docs. 63, 64).

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

With respect to facilities, or portions thereof, which were constructed prior to the enactment of the ADA (existing structures), the ADA defines "discrimination" as "a failure to remove architectural barriers ... in existing facilities, ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(iv). Thus, the ADA requires the removal of existing architectural or structural barriers that prevent access to existing public accommodations, when removal is "readily achievable," which is defined as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). If removal is not readily achievable, then the public accommodation must make its goods or services available to the disabled through alternative methods, if such alternative methods are readily achievable. See 42 U.S.C. § 12182(b)(2)(v).

A different, and heightened, standard applies with respect to those structures which were constructed post-ADA (new construction and post-ADA alterations). In this regard, the ADA defines "discrimination" as follows:

> [W]ith respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such

> a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

42 U.S.C. §12183(a)(2). Failure to design and construct a facility in compliance with this "new construction" standard constitutes intentional discrimination. See Access Now, Inc. v. South Florida Stadium Corp., 161 F. Supp.2d 1357, 1362 (S.D. Fla. 2001); Association For Disabled Americans, Inc. v. Concorde Gaming Corp., 158 F. Supp.2d 1353, 1362 n. 5 (S.D. Fla. 2001).

## II. THE ADA ACCESSIBILITY GUIDELINES

The ADA Accessibility Guidelines ("ADAAGs") are construction and design guidelines that offer a safe harbor for *new* construction (and post-ADA alterations), such that if a place of public accommodation is constructed (or altered) in compliance with the ADAAGs, it is in compliance with the ADA. See Rodriguez v. Investco, LLC, 305 F. Supp. 2d 1278, 1282 n. 15 (M.D. Fla. 2004).

With respect to existing (pre-ADA) structures, plaintiffs may offer evidence of ADAAG violations, but "the Court cannot determine the Defendants' liability from finding that elements of the [Defendant's facility] deviate from those standards." Brother v. CPL investments, Inc., 317 F. Supp. 2d 1358, 1368 (S.D. Fla. 2004). Allowing the ADA plaintiff to use the ADAAGs as evidence does not modify the ADA standard applicable to existing facilities: "In order to establish that the defendant has

violated the ADA, the Plaintiffs still must proffer evidence that removal of a given barrier is readily achievable." Id. at 1370.

## III. THE FLORIDA BUILDING ACCESSIBILITY CODES

The ADA authorizes the Department of Justice ("DOJ"), upon application by a State, to certify that a State law that establishes accessibility requirements meets or exceeds the minimum requirements of Title III of the ADA for new construction and post-ADA alterations. 42 U.S.C. § 12188(b)(I)(A)(ii); 28 CFR § 36.601 *et seq.* Certification constitutes rebuttable evidence, in an ADA enforcement action, that a building constructed or altered in accordance with the certified code complies with the new construction and alterations requirements of Title III of the ADA.[2] The State of Florida has its building and accessibility codes so certified by the DOJ. See (Def. Ex. 5, DOJ Notice of Certification, 63 Fed. Reg. 31,523-01 (June 9, 1998)).

Here, it is undisputed that at each stage of improvements (or alterations) undertaken by the Seahorse since its acquisition by its current owners in 1997, all changes or additions were certified as compliant with the applicable Florida codes. (Tr. 91-92).

---

[2] According to the Sixth Circuit: "Certification serves as 'rebuttable evidence' that a state law or local ordinance meets or exceeds the minimum requirements of the ADA in a later federal enforcement proceeding, see 42 U.S.C. § 12188(b)(I)(A)(ii), and compliance with a certified code is 'rebuttable evidence' of compliance with Title III of the ADA." United States v. Cinemark, Inc., 348 F.3d 569, 574 (6th Cir. 2003).

**IV.    THE BURDEN OF PROOF**

In <u>Gathright-Dietrich v. Atlanta Landmarks, Inc.</u>, 452 F.3d 1269 (11th Cir. 2006), the Eleventh Circuit adopted the burden-shifting approach fashioned by the Tenth Circuit in <u>Colorado Cross Disability Coalition v. Hermanson Family Limited Partnership I</u>, 264 F.3d 999 (10th Cir. 2001). With respect to an "existing facilities" ADA case,

> the plaintiff has the initial burden of production to show (1) that an architectural barrier exists; and (2) that the proposed method of architectural barrier removal is "readily achievable," i.e., "easily accomplishable and able to be carried out without much difficulty or expense" under the particular circumstances of the case. If the plaintiff meets this burden, the defendant then bears the ultimate burden of persuasion that barrier removal is not "readily achievable."

<u>Gathright-Dietrich</u>, 452 F.3d at 1273 (citations omitted). The Eleventh Circuit further held that,

> a plaintiff must present sufficient evidence so that a defendant can evaluate the proposed solution to a barrier, the difficulty of accomplishing it, the cost of implementation, and the economic operation of the facility. Without evidence on these issues, a defendant cannot determine if it can meet its subsequent burden of persuasion.

<u>Id.</u> at 1274.[3]

---

[3]Plaintiff relies upon the Second Circuit decision in <u>Roberts v. Royal Atlantic Corp.</u>, 542 F.3d 363 (2nd Cir. 2008), which imposes a lower initial burden upon an ADA plaintiff before shifting the burden to the defense. However, this Court must
(continued...)

## V. THE ALLEGED BARRIERS

At trial, Mr. Norkunas challenged several barriers as continuing ADA violations. He relied upon the report and expert testimony of Pablo Baez.[4] In rebuttal, the Seahorse offered the report and expert testimony of John M. Barley, II, FAIA.[5] The Court will address each of the continuing violations alleged by Mr. Norkunas at trial.

### A. The Walkway to the Beach

The Seahorse has an inaccessible wooden walkway that crosses over the dunes and leads to the beach.[6] See (P. Ex. 26, 27). The walkway is a post-ADA "alteration"; therefore, the new construction standard applies. Under this standard,

---

[3](...continued) apply the standard adopted by the Eleventh Circuit in Gathright-Dietrich, 452 F.3d 1269. Although Gathright-Dietrich was decided in the context of a summary judgment motion, the case upon which it relies was a bench trial. See Colorado Cross, 264 F.3d at 999. Another Court in this district has applied Gathright-Dietrich in a trial setting. See Pinero v. 4800 West Flagler, L.L.C., 2011 WL 346082, at *3 (S.D. Fla. Jan. 11, 2011).

[4]Mr. Baez has taken several classes in the field of ADA compliance and has served as an accessibility inspector since 2005. He is the current president of the ADA Compliance Consultants of the Carolinas, LLC. See (P. Ex. 38).

[5]Mr. Barley is a licensed architect in the State of Florida and has more than 40 years of architectural experience. He has extensive experience in ADA compliance and is a member of the College of Fellows of the American Institute of Architects ("AIA"). He has served as President of AIA Florida, as a member of the AIA Board of Directors and has chaired numerous chapter, state, and national AIA committees. See (Def. Ex. 2).

[6]The Seahorse acknowledges that it is not an accessible route (Tr. 167).

the Court must determine whether, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities. See 42 U.S.C. § 12183(a)(2).

Both parties are in agreement that there is no specific provision in either the ADAAGs or in the Florida Accessibility Code that requires beach walkways to be accessible (Tr. 145, 150). Nor were either of the experts aware of any case in which an accessible beach walkway had been required under the ADA (Tr. 169-70).[7] Under the general scoping (i.e., number and location) requirements for accessible routes, there likewise is no requirement that this particular beach walkway be made accessible. See Florida Accessibility Code 11-4.3. According to Mr. Barley, under the ADAAGs, "[the Seahorse is] not required to have an accessible route to every boundary of the property." (Tr. 160). And, as Mr. Baez conceded, if the scoping requirements "were met, then that's all they had to do, in terms of the number and location of accessible routes." (Tr. 149). Here, the number of accessible routes has not been challenged.

Additionally, the wooden beach walkway lies, in part, over state property which is within the regulated coastal construction zone (Tr. 94). The walkway was

---

[7]Other courts have determined in similar circumstances that the ADA does not require beach access. See Association/or Disabled Americans, Inc. v. Key Largo Bay Beach, LLC, 407 F. Supp. 2d 1321, 1357-58 (S.D. Fla. 2005); Thompson v. Sand Cliffs Owners Association, Inc., 1998 WL 35177067, at *8 n. 7 (N.D. Fla. March 30,1998).

permitted by the Florida Department of Environmental Protection ("DEP") in 1998 and remains subject to that permit.  See (Def. Ex. 44; Tr. 94).

Mr. Norkunas initially argued that on the landward side of the walkover the stairs should be replaced by a ramp system, but that stairs could be retained on the beach side of the walkway (the side which lies over state property).  See (P. Ex. 38). However, at trial, Mr. Baez claimed that the ADA required that the walkway be fully ramped, on both sides, all the way to the beach (Tr. 137-38).  Nevertheless, he did not have any opinion as to how high such a ramp could be built above the dunes and still comply with environmental regulations (Tr. 135).  He likewise does not have any knowledge or expertise in any of the areas of environmental permitting, structural or mechanical engineering that would support his proposal (Tr. 141).[8]

In the absence of any regulation requiring an accessible beach walkway, and in the absence of any general scoping requirement for accessible routes that would mandate an accessible beach walkway in this particular setting, there is no legal basis for this Court to hold that the walkway must be made accessible.[9]  Moreover,

---

[8]In support of his argument that ramps could have been included on both sides of the walkover, Mr. Baez relied on photographs of other dune walkovers in the area. Some of the walkovers had stairs, some had ramps.  Mr. Baez admitted that the walkways shown in these photographs were not compliant with the ADA (Tr. 151-52).

[9]At trial, there was testimony regarding accessibility guidelines for walkovers in federal lands such as national seashores (Tr. 156).  It was said that, where those guidelines are applicable, an accessible walkway is recommended or required every

(continued...)

Mr. Norkunas has not established the feasibility of constructing an accessible beach walkover. Accordingly, Mr. Norkunas has failed to prove an ADA violation with respect to the walkway to the beach.[10]

### B.     The Accessible Parking Space Adjacent to the Registration Office

At issue is the accessible parking space located outside Room 106 and adjacent to the registration office. See (P. Ex. 1, 15). This parking space was created in response to Mr. Norkunas' recommendation made in his deposition (Tr. 54-57; Def. Ex. 55, p.17). The creation (or relocation) of this space was an instance of barrier removal; therefore, the applicable standard is the "readily achievable" standard for existing facilities.

Mr. Baez testified that even after remediation he found an excessive slope at the northern end of the parking space (Tr. 180-83, 206). He opined that the excessive slope could be eliminated by repaving the space. However, Seahorse owner David W. Cole, Jr. testified that the parking space is on a slope, as the ground level of the Seahorse lies higher than the adjacent Atlantic Boulevard, and the space

---

[9](...continued)
half-mile (Tr. 158). However, on this record, the Court is not prepared to find any such requirement governing all oceanfront places of public accommodation.

[10]There is accessible public beach access (with available beach wheelchairs) immediately adjacent to the Seahorse's north border. Additionally, there is another accessible beach access point adjacent to the Seahorse on the south side of the motel that can be reached via the accessible route through the Seahorse's Lemon Bar. (Tr. 162-63).

was made as level as possible during the regrading and repaving process (Tr. 94-95).  According to Mr. Barley, "[t]he existing site topography is such that there is no practical way that this can be accomplished to be '... in full and strict compliance with the minimum requirements ...' Aside from a minor slope across the parking space, all other required features have been incorporated." (Def. Ex. 2, p. 4).  Mr. Barley also testified that the space currently meets the new construction standard (a higher standard than "readily achievable") (Tr. 204).[11]

Mr. Norkunas failed to provide any evidence as to what would be necessary to eliminate any remaining slope at the northern end of this parking space or how the flattening of this space could be accomplished without creating a steeper condition and potential hazards in other parts of the parking area.[12]  (Tr. 171).  Therefore, the Court finds that Plaintiff has not proven a continuing ADA violation.  Put another way, to the extent readily achievable, any existing barrier created by the lack of an accessible parking space in this area has now been removed.

---

[11]Mr. Baez inspected the Seahorse on February 23, 2010, nearly a year before the trial, and did not return to inspect the premises post-remediation (Tr. 108).

[12]A public accommodation is not required to make a modification or alteration, where allowing a disabled individual "to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations ... [would] pose a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).

### C.     The Accessible Parking Spaces Across the Street

The Seahorse has two accessible parking spaces located across the street from the motel. Mr. Norkunas claims that these two parking spaces are not the shortest route to the Seahorse's accessible entrances and that they require the crossing of a road; thus, they are noncompliant. (Tr. 182-84).

The Seahorse is required to have a minimum of two accessible parking spaces.[13] The Seahorse already maintains these two spaces on the property (one space in front of each of the Seahorse's accessible rooms). According to Mr. Cole, the two additional spaces located across the street serve not only the motel, but other commercial areas (Tr. 276-77). Mr. Barley testified that, "[t]here is nothing improper about having handicapped parking spaces available for use across the street from the hotel. In fact the two spaces across the street would not be required to satisfy the onsite parking requirements ... [T]hey [also] comply with all ADA requirements for size, striping and signage." (Def. Ex. 2, p. 5). The Court agrees and finds no violation with respect to these additional parking spaces.

### D.     Curb Ramp by the Registration Office

The Seahorse has an access aisle which runs from the accessible parking space located outside of Room 106 to the sidewalk leading to the registration office entrance. See (P. Ex. 16). Mr. Baez contends the curb ramp leading from the

---

[13]Mr. Norkunas has never challenged the required total number of available accessible spaces. (Tr. 202).

-11-

access aisle was one-half inch rather than one-quarter inch.   (Tr. 210-11).  He testified that if this "bumpy area" was smoothed out, there would not be a violation. (Tr. 213).  Mr. Cole's unrebutted testimony was that this has now been done (Tr. 277).  Accordingly, the Court finds there is no continuing ADA violation.

**E.    Stairway Handrails**

At issue is the interior stairway to the second floor located in the original section of the Seahorse. See (P. Ex. 17).  Mr. Baez testified that 12-inch extensions are required on the stairway handrails.  (Tr. 214).  As the original section of the motel was built in the 1950's, the applicable standard is the "readily achievable" standard for existing structures.

Mr. Norkunas has failed to present any evidence as to how this remediation would be readily achievable.  Indeed, Mr. Norkunas does not even offer an estimate of the total number of linear feet or total cost implicated by this remediation. Additionally, Mr. Barley testified that, "if we do those extensions at the second level, we are going to have them project into the width of the aisles that are the required Life Safety aisles.  And you simply cannot do that." (Tr. 219).  Mr. Norkunas has failed to establish the *prima facie* case required by Eleventh Circuit in Gathright-Dietrich.[14]

---

[14]Mr. Norkunas was asked about any exterior barriers which required removal. In his deposition, Mr. Norkunas did not mention modification of the handrails on the stairway and advised the Seahorse that removal of the ice machine to the first floor

(continued...)

### F.   Latch-Side Clearance on Gates

At issue is insufficient latch-side clearance on the gates in the pool area. See (P. Ex. 23, 24). Mr. Baez testified that additional clearance would be required on at least one of the pool gates. (Tr. 226-27). He acknowledged that, if such clearance space was added after his inspection, this issue would be eliminated. (Tr. 228). Mr. Cole's testimony that the required clearance has been added (Tr. 277-78) was unrebutted. Accordingly, the Court finds there is no continuing ADA violation with respect to the latch side clearance on the gates.

### G.   Keys

At issue is the Seahorse's use of oversized keys as a way of assisting its disabled guests. See (P. Ex. 10). Mr. Baez testified that, according to the ADAAGs, operating mechanisms should not require tight grasping and twisting to operate. (Tr. 230-31). However, Section 4.13 of the ADAAG manual provides that "keys, magnetic cards, and other devices not permanently fixed are not technically covered by ADAAG." (Tr. 233). The general ADAAG provisions upon which Mr. Baez attempted to rely govern the fixed door hardware and are therefore inapplicable to keys. Accordingly, the Court finds Mr. Norkunas has failed to establish an ADA violation with respect to the Seahorse's use of oversized keys.

---

[14](...continued)
would satisfy his requirements for barrier removal. (Def. Ex. 55, p. 41; Tr. 57-58). The Seahorse has since moved the ice machine to the first floor.

### H.   Outdoor Shower Pull

The shower pull is used to operate the outdoor shower.  See (P. Ex. 6). Although Mr. Baez initially claimed that the Seahorse's implementation of a ring to operate the pull was inadequate due to the lack of a separate, written policy requiring inspection on the ring for rust (Tr. 234-35), he later withdrew that claim and conceded that the outdoor shower pull is now compliant (Tr. 240).  Accordingly, the Court finds there is no ADA violation.

### I.   Lemon Bar Restrooms

In his report, Mr. Baez cited numerous areas of noncompliance with respect to the Lemon Bar restrooms.  See (Pl. Ex. 38).  However, Mr. Cole testified that, following receipt of Mr. Baez's report, the Seahorse made the requested modifications - which Mr. Barley later inspected and found to be compliant.[15]  (Tr. 89-90, 93; Def. Ex. 2, p. 8).

At trial, Mr. Baez attempted to challenge these remediations with opinions that were not previously disclosed and were not based on any actual inspection, evaluation, or measurement.  Instead, Mr. Baez attempted to count tiles on the wall

---

[15]The following items were addressed in Mr. Baez's report and remedied: Toilet stall doors and hinges; lavatories' vertical clearance underneath counter, provide proper knee clearance and countertop, pipes installed correctly with foam insulation; and toilet paper dispensers and grab bar locations.  Mr. Cole testified that these items were remedied following Mr. Baez's inspection and report (Tr. 89-90, 282-83); Mr. Barley's report states that he inspected the restrooms post-remediation and found them to be compliant (Def. Ex. 2, p. 8).

in photographs to demonstrate that distances were still non-compliant. See (P. Ex. 2, 34; Tr. 249-51). The Court finds this is not reliable evidence and that Mr. Norkunas has failed to prove an existing barrier.

### J.     Threshold to Accessible Room 118

At issue is the width of the threshold to Accessible Room 118. See (P. Ex. 9; Tr. 262-67). Again, this criticism was not disclosed in Mr. Baez's report and is not based on any actual measurements. (P. Ex. 38; Tr. 266-67). Rather, Mr. Baez's attempts to opine by looking at a photograph of the threshold. (Tr. 267). This evidence is not reliable.[16]

### K.     Route near Southwest Corner of the Seahorse

At issue is the inaccessible sidewalk in the southwest corner of the Seahorse. See (P. Ex. 3, 4, 5). The Seahorse concedes that this is not an accessible route and claims it was not intended to be. (Tr. 271-72). Mr. Norkunas offered no evidence or standard that would mandate that this pre-existing narrow sidewalk around the corner of the property must be an accessible route. Nor has Mr. Norkunas demonstrated how the remediation would be "readily achievable." Therefore, the Court finds Mr. Norkunas has failed to establish an ADA violation with respect to this sidewalk.

---

[16]The Court previously held that Mr. Norkunas does not have standing to challenge any alleged barriers in the guest rooms (Doc. 28). See Norkunas v. Seahorse NB, LLC, 720 F. Supp. 2d at 1321.

## VI.  ATTORNEYS' FEES AND COSTS

Although certain areas of the Seahorse were in violation of the ADA at the time the complaint was filed, the Court finds there are no proven continuing violations.  Under Title III of the ADA plaintiffs "cannot ... recover their attorney's fees for serving as a 'catalyst,' i.e., that they caused [defendant] to implement the changes they sought." American Ass'n of People with Disabilities v. Harris, 605 F.3d 1124, 1137 n. 26 (11th Cir. 2010) (citing Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 610, 121 S. Ct. 1835, 1843, 149 L. Ed. 2d 855 (2001)).  As there are no continuing ADA violations, Mr. Norkunas' claim for attorneys' fees and costs must therefore also be denied.

## VII.  CONCLUSION

As this case began, the Seahorse was non-compliant with the ADA in several respects.  Rather than give notice to the Seahorse of these deficiencies, Mr. Norkunas, an experienced ADA plaintiff, sued.  In response, the Seahorse began to remedy the deficiencies noted by Mr. Norkunas (and later by his expert).  This began a process by which over the course of the litigation, Mr. Norkunas would identify a defect and the Seahorse would hurry to fix it.  This back and forth continued up until the time of trial.  Then, at trial, having substantially achieved their goal of ADA compliance, Mr. Norkunas and his expert were largely left to argue previously undisclosed deficiencies and that the remediations were themselves insufficient.

Presumably, this "cat and mouse" game is due to the nature of the ADA (which provides only prospective injunctive relief for continuing violations) and the rejection of the "catalyst" theory of attorneys' fees recovery, but there must be a better way to achieve ADA compliance.

Mr. Norkunas has failed to establish a continuing case of discrimination under Title III of the ADA. Therefore, judgment shall be entered in favor of the Seahorse and against Mr. Norkunas.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida this 23rd day of May, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

Copies to:

Counsel of Record